2003 UT App 410

**STATE of Utah, Plaintiff and Appellee,**

v.

**Tanja RYNHART, Defendant
and Appellant.**

**No. 20020760–CA.**

Court of Appeals of Utah.

Nov. 28, 2003.

Rehearing Denied Dec. 18, 2003.

James M. Retallick, Public Defenders Association, Ogden, for Appellant.

Mark L. Shurtleff, Attorney General, and Marian Decker, Assistant Attorney General, Salt Lake City, for Appellee.

Before DAVIS, GREENWOOD, and THORNE, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Tanja Rynhart appeals from a trial court order denying her motion to suppress evidence seized during a warrantless search of her vehicle. We reverse.

## BACKGROUND

¶ 2 On the morning of January 6, 2002, Officer Robert Burnham of the Brigham City Police Department received a dispatch call requesting investigation of an abandoned or wrecked vehicle. Burnham responded to the call at approximately 8:30 a.m. Upon arriving at the location of the vehicle, Burnham discovered that the vehicle had "traveled over the curb, down an embankment, [and] through two fences," before coming to rest in a "marsh" or "swamp." Burnham also discovered that the tire tracks leading to the vehicle were covered with snow. Because Burnham recalled that "[i]t had snowed as recently as 3:00" a.m., he determined that the accident had occurred at some point prior to that time.

¶ 3 As Burnham approached the vehicle, he saw that it had a license plate, but he did not attempt to identify the owner of the vehicle by using the license plate number. Burnham entered the unlocked vehicle and discovered that there was no one inside. At the May 29, 2002 preliminary hearing, Burnham testified that his purpose for entering the vehicle was to "[t]ry to find out the identity of the owner, the driver, and if anybody was in the vehicle at all." However, at the July 22, 2002 hear-

ing on the motion to suppress, Burnham admitted that he performed a "very thorough search" of the vehicle, and testified that he "opened all the doors" and "looked under the seats." He testified that there were "quite a number of items in the vehicle," but admitted that he did not inventory all of the vehicle's contents. Burnham indicated that he was "primarily concerned with" finding and retrieving any "jewelry," "money," or "valuables" that may have been left in the vehicle.

¶ 4 In his search of the vehicle, Burnham found a partially full bottle of vodka in the console between the two front seats, a briefcase on the front passenger seat, and a purse on the floor near the front passenger seat. He searched through the purse and the briefcase to determine their contents. Inside the purse, Burnham found a wallet, which he also searched. In his search of the purse and the wallet, Burnham found Rynhart's driver license, $329 in cash, several gift certificates, a small plastic bag containing a "white powdery substance," and "a mirror with some powder on it."

¶ 5 After Burnham completed his investigation, he had the vehicle towed to a wrecking yard for "safe keeping," but did not officially impound the vehicle.[1] He retained the briefcase, the purse, and the items he found in the purse. At some point after he had "cleared from the scene" of the accident, Burnham attempted to contact Rynhart by phone, but was unsuccessful. Later that afternoon, someone from the wrecking yard contacted Burnham by phone to notify him that Rynhart was attempting to retrieve her vehicle. Burnham went to the wrecking yard and met with Rynhart. At that time, Burnham asked Rynhart about the small plastic bag containing white powder that he had found in Rynhart's purse. Rynhart admitted to Burnham that the small plastic bag contained cocaine, but told him that it belonged to a friend.

¶ 6 On March 27, 2002, Rynhart was charged with possession of a controlled sub-

stance within 1000 feet of a public structure, a second degree felony, and possession of drug paraphernalia, a class B misdemeanor. At the conclusion of the May 29, 2002 preliminary hearing, the trial court ruled that there were "reasonable grounds to believe that [Rynhart] committed the offense[s]" and, accordingly, "requir[ed] that [Rynhart] be held to answer on the charges." Rynhart pleaded not guilty to both charges.

¶ 7 Thereafter, Rynhart filed a motion to suppress the evidence seized during Burnham's warrantless search of her vehicle. In its ruling on Rynhart's motion, the trial court determined that Rynhart had not abandoned her expectation of privacy in her vehicle. In support of this determination, the trial court made the following findings, which are not challenged on appeal:

> The officer inspected the vehicle at 8:30 in the morning and determined that it had been in the marsh since at least 3:00 ... that morning. The owner or driver would not have had time to make arrangements to retrieve the vehicle if it was damaged. The State failed to present any evidence of the state of the vehicle. If the vehicle could be driven, then the officer may have been more justified in believing that it had been abandoned. Although there clearly had been an accident, it appears that no other vehicles were involved. The apparent early hour, the winter conditions, and the single vehicle nature of the accident all combine to belie the officer's imputing an intent to abandon the vehicle.

However, the trial court also determined that Burnham's warrantless search of Rynhart's vehicle was justified under the emergency aid doctrine.[2] See Salt Lake City v. Davidson, 2000 UT App 12, ¶ 12, 994 P.2d 1283. In support of this determination the trial court entered the following findings:

> The accident occurred around 3:00 a.m. on a cold January night. The absence of the driver made it imperative that the officer identify the driver so that he or she could

---

1. Burnham neither attempted to obtain a warrant nor conduct an inventory search.

2. Although the trial court refers to this doctrine as "the community caretaker function" in its ruling, it applies the elements of the emergency

aid doctrine set forth in Salt Lake City v. Davidson, 2000 UT App 12, ¶ 12, 994 P.2d 1283, to determine whether Burnham's warrantless search of Rynhart's vehicle was justified.

be found. The driver could have been in distress and lost or disoriented. The officer acted appropriately in attempting to determine who was [sic] the driver. Although [Rynhart] makes a good point that the owner of the vehicle could be ascertained by using the license plate number, the owner and the driver are not necessarily the same person, and the officer had a duty to ascertain the facts in order to preserve life in the event the driver had wandered off and was lost.

Based upon its conclusion that the emergency aid doctrine was applicable, the trial court

denied Rynhart's motion to suppress in an order dated September 3, 2002.

¶ 8 On September 23, 2002, Rynhart petitioned this court, pursuant to rule 5 of the Utah Rules of Appellate Procedure, to permit her appeal from the trial court's interlocutory order denying her motion to suppress. On November 5, 2002, we granted that petition and Rynhart's appeal ensued.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 9 The sole issue on appeal is whether the trial court erred in denying Rynhart's motion to suppress evidence.[3] The trial

---

3. Although this is the sole issue raised by Rynhart, the State suggests that we should, without the benefit of a cross-appeal, reverse the trial court's ruling that Rynhart had not abandoned her expectation of privacy in her vehicle. Not only does the record offer scant support for that proposition, it offers *no* support whatsoever that Rynhart abandoned her expectation of privacy in her purse and the contents thereof, or her wallet and the contents thereof. In *State v. Bissegger*, 2003 UT App 256, 76 P.3d 178, we cited numerous cases addressing the issue of a motor vehicle occupant's expectation of privacy in personal belongings left in the vehicle.
 *See, e.g., United States v. Salazar*, 805 F.2d 1394, 1396 (9th Cir.1986) (holding that a car passenger had a reasonable expectation of privacy in his closed brown paper bag found on the floorboard of his companion's car); *People v. Manke*, 181 Ill.App.3d 374, 130 Ill.Dec. 192, 537 N.E.2d 13, 15 (1989) (concluding that a car passenger whose closed brown paper bag was found in car's trunk, and was searched by police, had standing to challenge search); *Arnold v. Commonwealth*, 17 Va.App. 313, 437 S.E.2d 235, 237 (1993) (holding that a car passenger had a legitimate expectation of privacy in his closed plastic shopping bag found on the floor of the car).
 Other jurisdictions have also held that car passengers have a legitimate expectation of privacy in their coats or jackets found in cars. *See People v. Armendarez*, 188 Mich.App. 61, 468 N.W.2d 893, 900 (1991) (finding that car passenger had "standing to object to the search of his personal effects in the car, namely, his coat," where his coat was found on front seat of vehicle); *State v. McCarthy*, 258 Mont. 51, 852 P.2d 111, 112–13 (1993) (holding that car passenger had legitimate expectation of privacy in his jacket found crumpled on the back seat of car).
 Finally, other jurisdictions have found that car passengers have a legitimate expectation of privacy in their purses left in cars. *See United States v. Buchner*, 7 F.3d 1149, 1151, 1154 (5th Cir.1993) (holding that the owner of a shoulder bag, located on the front seat of his girlfriend's

car, had a legitimate expectation of privacy in the bag and its contents); *United States v. Welch*, 4 F.3d 761, 764 (9th Cir.1993) (holding that car passenger who left her purse in her boyfriend's car "had a reasonable expectation of privacy in the contents of her purse. Indeed, a purse is a type of container in which a person possesses the highest expectations of privacy."); *State v. Friedel*, 714 N.E.2d 1231, 1235–37 (Ind.Ct.App.1999) (holding that car passenger whose purse was found on floor behind driver's seat and searched had standing because "a purse is clearly a container in which a person has a legitimate expectation of privacy").
*Bissegger*, 2003 UT App 256 at ¶¶ 9–11, 76 P.3d 178.
 In his dissent, our colleague admits that these cases clearly support the proposition that vehicle occupants may possess a legitimate expectation of privacy in their personal belongings left in a vehicle. However, he asserts that we have "mistakenly" focused our attention on these cases and the proposition they stand for in reaching our conclusion that Rynhart did not abandon her expectation of privacy in her vehicle or its contents. He misapprehends our reliance upon these cases and the proposition they stand for. We do not rely upon these cases as the sole support for our ultimate conclusion on abandonment; rather, we rely upon these cases for the proposition that our colleague admits they stand for—that Rynhart, as a vehicle occupant, may have possessed a legitimate expectation of privacy in the contents of her vehicle.
 We then determine that (1) Rynhart clearly had "a subjective expectation of privacy" not just in her vehicle, but also in its contents; and (2) as the trial court's unchallenged findings on abandonment establish, that this "expectation was objectively reasonable." *Id.* at ¶ 7 (quotations and citation omitted). Accordingly, Rynhart did have a legitimate expectation of privacy both in her vehicle and in its contents. *See id.*
 Finally, again based upon the trial court's unchallenged findings on abandonment, we conclude that Rynhart never "voluntarily relin-

court denied the motion based upon its determination that the warrantless search of Rynhart's vehicle was justified under the emergency aid doctrine. *See Salt Lake City v. Davidson*, 2000 UT App 12,¶ 12, 994 P.2d 1283.

The factual findings underlying a trial court's decision to grant or deny a motion to suppress evidence are reviewed under the deferential clearly-erroneous standard, and the legal conclusions are reviewed for correctness, with a measure of discretion given to the trial judge's application of the legal standard to the facts.

*State v. Moreno*, 910 P.2d 1245, 1247 (Utah Ct.App.1996).

## ANALYSIS

¶ 10 Rynhart argues that the trial court erred in denying her motion to suppress evidence. The trial court denied the motion based upon its determination that the warrantless search of Rynhart's vehicle was justified under the emergency aid doctrine. *See Salt Lake City v. Davidson*, 2000 UT App 12,¶ 12, 994 P.2d 1283.

¶ 11 "The Fourth Amendment prohibits all unreasonable searches and seizures. Warrantless searches are per se unreasonable unless undertaken pursuant to a recognized exception to the warrant requirement." *State v. Brown*, 853 P.2d 851, 855 (Utah 1992) (citation omitted). "The burden of establishing the existence of one of the exceptions to the warrant requirement is on the prosecution." *State v. Arroyo*, 796 P.2d 684, 687 (Utah 1990); *see State v. Shoulderblade*, 905 P.2d 289, 294 (Utah 1995). "One such exception to the warrant requirement recognized by both the United States Supreme Court and Utah's appellate courts is exigent circumstances. The emergency aid doctrine, sometimes referred to as the medical emergency doctrine, is a variant of the exigent circumstances doctrine." *Davidson*, 2000

quish[ed] a reasonable expectation of privacy" and, accordingly, that she did not abandon her expectation of privacy in her vehicle or in its contents. *Id.* at ¶ 14 (quotations and citation omitted).

In an era when our citizens' expectations of privacy are not only being eroded, but affirma-

UT App 12 at ¶¶ 9–10, 994 P.2d 1283 (citations omitted).

¶ 12 In *Davidson*, we explained that

"[t]he [emergency aid doctrine] will support a warrantless search of a person or personal effects when [a] person is found in an unconscious or semiconscious condition and the purpose of the search is to discover evidence of identification and other information that might enhance the prospect of administering appropriate medical assistance, and the rationale is that the need to protect life or avoid serious injury to another is paramount to the rights of privacy...." Several courts have also applied the emergency aid doctrine when a person is missing and feared to be injured or dead.

*Id.* (third and fourth alterations in original) (quoting Tracy A. Bateman, Annotation, *Lawfulness of Search of Person or Personal Effects Under Medical Emergency Exception to Warrant Requirement*, 11 A.L.R. 5th 52, § 2[a] (1993)). We adopted the emergency aid doctrine in *Davidson, see id.* at ¶ 13, and provided the following test for its application:

[A] warrantless search is lawful under the emergency aid doctrine if the following requirements are met:

(1) Police have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need for their assistance for the protection of life.

(2) The search is not primarily motivated by intent to arrest and seize evidence.

(3) There is some reasonable basis to associate the emergency with the area or place to be searched. That is, there must be a connection with the area to be searched and the emergency.

*Id.* at ¶ 12 (quotations and citation omitted). Under this test, "[w]hether an emergency exists is fact intensive and the [S]tate has the

tively attacked, we, too, are puzzled by the herculean effort of our esteemed colleague to obtain a result that not only is unsupported by the authorities he relies upon, unsupported by the facts, and contrary to the express ruling of the trial court, but also further erodes what is left of legitimate expectations of privacy.

burden to prove that the exigencies of the situation make the course imperative." *Id.* at ¶ 10 (quotations and citation omitted). "This court has observed that application of the emergency aid doctrine should be strictly circumscribed ... because of the significant departure [it] takes from Fourth Amendment jurisprudence by requiring neither a warrant nor probable cause as prerequisites to a search." *State v. Comer,* 2002 UT App 219,-¶ 17, 51 P.3d 55 (quotations and citations omitted), *cert. denied,* 59 P.3d 603 (Utah 2002).

¶ 13 To satisfy the first prong of the emergency aid doctrine, the State must show that Burnham had "an objectively reasonable basis to believe that an emergency exist[ed]" and that he believed there was "an immediate need for [his] assistance for the protection of life." *Davidson,* 2000 UT App 12 at ¶ 12, 994 P.2d 1283 (quotations and citation omitted). Our review of the record and the trial court's ruling reveals that several of the trial court's findings relating to the first prong are clearly erroneous.

¶ 14 The trial court determined that the first prong was satisfied based upon several findings. The trial court's findings that "[t]he accident occurred around 3:00 a.m. on a cold January night," and that the driver was "absen[t]" are supported by evidence in the record. Although these findings certainly weigh in favor of satisfying the first prong, in this case they are not sufficient, without more, to satisfy the first prong. The trial court's other findings that "[t]he driver could have been in distress and lost or disoriented" and that "the officer had a duty ... to preserve life in the event the driver had wandered off and was lost" are speculative and unsupported by evidence in the record. There is no evidence in the record indicating that facts gathered by Burnham at the scene of the accident were objectively indicative of injury to possible victims of the accident which would require him to "preserve life," or of any passengers of the vehicle being "lost," "disoriented," or "in distress."[4] Accordingly, we conclude that these unsupported findings are clearly erroneous.

¶ 15 Because the aforesaid findings are clearly erroneous, we conclude that the trial court erred in determining that the first prong of the emergency aid doctrine was satisfied. Consequently, the trial court erred in concluding that the emergency aid doctrine was applicable in this case.

¶ 16 Moreover, when "strictly circumscribed," the emergency aid doctrine, as a whole, does not apply to the facts of this case. *Comer,* 2002 UT App 219 at ¶ 17, 51 P.3d 55 (quotations and citations omitted). First, because Burnham did not find anyone in the vehicle in an "unconscious or semiconscious condition," the doctrine would be applicable only if "a person [was] missing and feared to be injured or dead." *Davidson,* 2000 UT App 12 at ¶ 10, 994 P.2d 1283 (quotations and citations omitted). In that situation, "there must be some reliable and specific indication of the probability that a person is suffering from a serious physical injury before application of the [emergency aid] doctrine is justified." *Comer,* 2002 UT App 219 at ¶ 20, 51 P.3d 55. There is no evidence in the record indicating that Burnham ever observed anything at the scene of the accident that was a "reliable and specific indication of the probability that a person [was] suffering from a serious physical injury." *Id.* Without these indications, not only was Burnham not justified in searching the purse or wallet under the emergency aid doctrine, he had no reason to believe that anything that may be found in the purse or wallet would provide these indications, or that the owner of the purse or wallet was even in the vehicle when it left the roadway. Second, under the rationale of the emergency aid doctrine, a warrantless search is allowed if "the purpose of the search is to discover evidence of identification and other information that might enhance the prospect of administering appropriate medical assistance, ... protect[ing] life[,] or avoid[ing] serious injury to another." *Davidson,* 2000 UT App 12 at ¶ 10, 994 P.2d 1283 (quotations and citation omitted). Although Burnham did discover Rynhart's driver license during his warrantless search of her purse and wallet, there is no evidence in the record indicating

---

4.  Indeed, the accident occurred on a major street within 1000 feet of a public structure.

that he searched these items for this purpose. Other than his phone calls to Rynhart, there is no evidence in the record suggesting that he took any action after completing his search of these items that could be construed as an attempt to provide "appropriate medical assistance, ... protect life[,] or avoid serious injury to another." *Id.* (quotations and citation omitted). Consequently, the trial court's application of the emergency aid doctrine, as a whole, to the facts of this case was improper.

¶ 17 Based upon the foregoing, we conclude that the trial court erred in determining that the emergency aid doctrine was applicable in this case. Therefore, we conclude that the trial court erred in denying Rynhart's motion to suppress evidence seized during the warrantless search of her vehicle.

## CONCLUSION

¶ 18 We conclude that several of the trial court's findings relating to the first prong of the emergency aid doctrine are clearly erroneous. Because these findings are clearly erroneous, we conclude that the trial court erred in determining that the first prong was satisfied and that the emergency aid doctrine was applicable in this case. Moreover, we conclude that the emergency aid doctrine, as a whole, is inapplicable to the facts of this case. Therefore, we conclude that the trial court erred in denying Rynhart's motion to suppress evidence seized during the warrantless search of her vehicle.

¶ 19 I CONCUR: PAMELA T. GREENWOOD, Judge.

THORNE, Judge (concurring and dissenting):

¶ 20 I concur with the majority's conclusion that the trial court erred in admitting the evidence under the emergency aid doctrine. However, we part ways when the majority concludes that Rynhart maintained a reasonable expectation of privacy in the van and its contents when, following a single car accident, she left it, unsecured and parked on property not owned by Rynhart.[1] My reasons for dissenting are threefold: (1) The majority, in summarily deciding that Rynhart did not abandon her expectation of privacy, relies on a series of cases that have little or nothing to do with the issue of abandonment; (2) the abandonment standard relied upon by the majority is actually a standard applicable to property law and it flies in the face of widely accepted abandonment analysis for Fourth Amendment purposes; and (3) even under the existing Utah standard, Rynhart abandoned her subjective expectation of privacy.

¶ 21 The majority, in drawing its conclusion, relies on a series of cases found in *State v. Bissegger*, 2003 UT App 256, ¶¶ 13–15, 76 P.3d 178. However, not only did the *Bissegger* court cite these cases for a different proposition altogether, *see id.* at ¶¶ 9–11, none of the cited cases addresses the abandonment of a legitimate expectation of privacy. *See United States v. Buchner*, 7 F.3d 1149, 1154–55 (5th Cir.1993) (addressing the scope of third party consent and probable cause to search); *United States v. Welch*, 4 F.3d 761, 765 (9th Cir.1993) (addressing the scope and effect of third party consent to search); *United States v. Salazar*, 805 F.2d 1394, 1396–98 (9th Cir.1986) (addressing a car passenger's standing to object to a search and the scope of the automobile exception to the Fourth Amendment's warrant requirement), *overruled by implication by United States v. Lopez–Angulo*, 1992 LEXIS 26380, *2 (9th Cir. October 8, 1992); *State v. Manke*, 181 Ill.App.3d 374, 130 Ill.Dec. 192, 537 N.E.2d 13, 15 (1989) (addressing a passenger's standing to object to an automobile search, as well as the voluntariness of the driver's consent to a search); *State v. Frie-*

1. The majority points out the fact that the State failed to file a cross appeal on the issue of abandonment. However, the State was under no duty to do so. We are permitted to affirm the trial court's order—in this case the denial of the motion to suppress—on any grounds apparent from the record, even if the trial court addressed the ground we rely upon in a subsidiary ruling.

*See State v. South*, 924 P.2d 354, 356 (Utah 1996). Thus, if we are able to conclude from the record before us that Rynhart abandoned her reasonable expectation of privacy in the van, we can affirm the trial court's denial of Rynhart's motion to suppress on these grounds. *See id.* at 357.

*del*, 714 N.E.2d 1231, 1240 (Ind.Ct.App.1999) (addressing the scope and effect of a car owner's consent to search an automobile on a passenger's property contained within the car);[2] *State v. Armendarez*, 188 Mich.App. 61, 468 N.W.2d 893, 900–01 (1991) (examining a passenger's standing to object to a search of his personal belongings found in the car and concluding that the passenger's belongings were subject to search pursuant to the automobile exception to the Fourth Amendment warrant requirement); *State v. McCarthy*, 258 Mont. 51, 852 P.2d 111, 113–14 (1993) (addressing the scope of the automobile exception and its applicability to containers and other objects found within the car to be searched); *Arnold v. Virginia*, 17 Va.App. 313, 437 S.E.2d 235, 238 (1993) (addressing a person's standing to object to searches of their own property, but disposing of the argument under the plain view exception to the Fourth Amendment warrant requirement).

¶ 22 In relying on these cases, the majority mistakenly focuses its attention on the existence of a passenger's legitimate expectation of privacy in personal belongings located in a vehicle. From the aforementioned cases, clearly cited in *Bissegger*, there is no question that passengers in automobiles may possess a legitimate expectation of privacy in their own belongings located in a vehicle. *See also Wyoming v. Houghton*, 526 U.S. 295, 303, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408 (1999) ("Passengers, no less than drivers, possess a reduced expectation of privacy with regard to property that they transport in cars, which 'trave[l] public thoroughfares.' ") (alteration in original) (citation omitted).

¶ 23 However, these cases do not support the conclusion that Rynhart maintained a legitimate or reasonable expectation of privacy in either the van or the purse.[3]

¶ 24 Instead, our analysis should follow either *United States v. Barlow*, 17 F.3d 85 (5th Cir.1994), or *United States v. Oswald*, 783 F.2d 663 (6th Cir.1986), in addressing this issue.[4] In *Barlow*, following a robbery,

2. *State v. Friedel*, 714 N.E.2d 1231 (Ind.Ct.App. 1999), briefly mentions, then summarily disposes of, the doctrine of abandonment, without venturing into any substantive analysis of the issue, presumably due to its inapplicability in the case. *See id.* at 1241.

3. I am also puzzled by the majority's focus on the purse. While, admittedly, the critical evidence was discovered in the purse, had this situation involved only the purse, and not the van, there is little question that the officer's conduct would be considered eminently reasonable. The officer would have reasonably concluded that the purse, or at least the owner's reasonable expectation of privacy, had been abandoned. Thus, the critical question is whether Rynhart had or retained a legitimate privacy interest in the van, and, through the van, in its contents. *See Wyoming v. Houghton*, 526 U.S. 295, 306–07, 119 S.Ct. 1297, 1303–04, 143 L.Ed.2d 408 (1999) (acknowledging that containers in a vehicle are to be treated as a part of the vehicle for purposes of Fourth Amendment analysis).

4. The *Bissegger* court, in addressing the State's abandonment argument, relied upon *State v. Rowe*, 806 P.2d 730 (Utah Ct.App.1991), *rev'd*, 850 P.2d 427 (Utah 1992) (reversing our conclusion that the warrant was invalid, thus, the supreme court had no reason to address the abandonment issue). *See State v. Bissegger*, 2003 UT App 256, ¶¶ 13–15, 76 P.3d 178. However, while the *Bissegger* court noted that *Rowe* had been reversed, it failed to acknowledge that the *Rowe* decision is at best a plurality. *See Rowe*, 806 P.2d at 739 (Garff, J., concurring); 806 P.2d at

740 (Jackson, J., dissenting). Thus, the precedential value of *Rowe* is limited. Moreover, I believe that our particular abandonment standard, based on the Fourth Amendment to the United States Constitution, is fatally flawed. Through this standard, we have placed the burden on the state to show by clear, unequivocal, and decisive evidence, that the defendant actually intended to abandon his or her legitimate right to privacy. *See Bissegger*, 2003 UT App 256 at ¶ 14, 76 P.3d 178. There are two problems with this standard.

First, the expectation that the state must, essentially, prove abandonment by clear and convincing evidence, *see Rowe*, 806 P.2d at 736 (stating that "[t]he burden of proving abandonment falls on the state, and must be shown by 'clear, unequivocal and decisive evidence' " (citation omitted)), does not comport with the expectations of most other courts. *See United States v. Pitts*, 322 F.3d 449, 456 (7th Cir.2003) ("To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's ... actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched."), *cert. denied*, — U.S. —, 124 S.Ct. 128, 157 L.Ed.2d 90 (2003); *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir.2000) ("To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his

property interests in the item searched or seized.").

Moreover, the "clear, unequivocal and decisive evidence" standard adopted in *Rowe* is actually the standard of evidence applied in civil cases dealing with the abandonment of a property right, not the abandonment of a legitimate expectation of privacy, *see Friedman v. United States*, 347 F.2d 697, 704–06 (8th Cir.1965) (addressing the question of whether the defendants in the case had abandoned their *property rights* to certain premises or its contents), and it seems to have been unwisely imported into Fourth Amendment jurisprudence. *Accord State v. Finney*, No. 21180, 2003 WL 245727, *5, 2003 Ohio App. LEXIS 518, *14 (Ohio Ct.App. February 5, 2003) (" 'The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' " (citation omitted)); *State v. Villegas*, No. 21100–2–III, 116 Wash.App. 1014, 2003 WL 1091032, *2 2003 Wash.App. LEXIS 416, *6 (Wash.Ct.App. March 13, 2003) (stating "the crux of our analysis is not [the defendant's] interest [in the container] as applied under property law, but his reasonable expectation of privacy in the [container] under a potential illegal search analysis."), *amended by* No. 21100–2–III, 2003 Wash.App. LEXIS 1097 (June 3, 2003); *see Linscomb v. Goodyear Tire & Rubber Co.*, 199 F.2d 431, 433 (8th Cir.1952) (abandonment as an affirmative defense in replevin action); *Williams v. Barnette*, No. CA98–1261, 1999 WL 360291, **1–5 1999 Ark.App. LEXIS 409, **1–4 (Ark.Ct.App. June 2, 1999) (abandonment and easements); *Stone v. Geyser Quicksilver Mining Co.*, 52 Cal. 315, 317–18 (1877) (abandonment and mining rights); *Mineral Mgmt. Group, Inc. v. Chandler*, NO.2002–CA–001178–MR, 2003 WL 21246036, **1–3 2003 Ky.App. LEXIS 135, **1–3 (Ky.Ct. App. May 30, 2003) (abandonment and natural gas leases); *Phillips v. Gregg*, 628 A.2d 151, 152–53 (Me.1993) (abandonment and easements); *Doherty v. Russell*, 116 Me. 269, 101 A. 305, 306–07 (1917) (abandonment and life estates); *Stieff v. Collins*, 237 Md. 601, 207 A.2d 489, 490–91 (1965) (abandonment of nonconforming use); *Clausi v. Meddaugh*, 116 A.D.2d 850, 498 N.Y.S.2d 267, 268 (N.Y.App.Div.1986) (abandonment and easements); *Consolidated Rail Corp. v. MASP Equip. Corp.*, 67 N.Y.2d 35, 499 N.Y.S.2d 647, 490 N.E.2d 514 1986 N.Y. LEXIS 16334, **4–6 (N.Y. February 11, 1986) (abandonment and easements); *New York Connecting R. Co. v. Queens Used Auto Parts, Inc.*, 72 N.Y.S.2d 546, 549–50 (N.Y.Sup.1947) (abandonment and easements), *modified*, 273 A.D. 908, 77 N.Y.S.2d 505 (N.Y.App.Div.1948); *Moore v. DeVault*, No. M2001–02225–COA–R3–CV, 2002 WL 31769110, **1–3 2002 Tenn.App. LEXIS 864, **8–10 (Tenn. Ct.App. December 11, 2002) (abandonment and easements); *Second Chance Farms, Inc. v. Perry County*, No. M200–00513–COA–R3–CV, 2001 WL 219642, **5–6 2001 Tenn.App. LEXIS 145, **11–15 (Tenn.Ct.App. March 7, 2001) (abandonment and public roads); *Lipscomb v. Commins*, 212 Va. 543, 186 S.E.2d 74, 74–75 (1972) (per curiam) (abandonment and rights of way); *see also Simms v. District of Columbia*, 612 A.2d 215, 218–19 (D.C.1992) (abandonment of property as an affirmative defense); *Williams v. United States*, 337 A.2d 772, 774 (D.C.1975) (same).

Second, our requirement that the state prove the *defendant's* intent, in other words the adoption of a subjective standard of proof, also fails to comport with most other courts' analyses of this issue. *See, e.g., United States v. Lonedog*, 67 Fed.Appx. 543, 2003 WL 21357264 2003 U.S.App. LEXIS 11687 (10th Cir.2003) ("The abandonment determination is made by objective standards. However, an expectation of privacy is a question of intent which may be inferred from words spoken, acts done, and other objective facts."); *Pitts*, 322 F.3d at 456; ("[Abandonment] is an objective test[.]"); *Basinski*, 226 F.3d at 836 ("Because this is an objective test, it does not matter whether the defendant harbors a desire to later reclaim an item; we look solely to the external manifestations of his intent as judged by a reasonable person possessing the same knowledge available to the government agents."); *United States v. Yiu–Pong Liu*, 180 F.3d 957, 960 (8th Cir.1999) (" '[W]hether an abandonment has occurred is determined on the basis of objective facts available to the investigating officers, not on the basis of the owner's subjective intent.' " (citation omitted)); *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983) ("The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. This determination is to be made by objective standards." (citation omitted)); *United States v. Gutierrez–Medina*, 41 F.Supp.2d 1191, 1195 (E.D.Wash.1998) ("The test [for abandonment of a legitimate expectation of privacy] is an objective one and intent may be *inferred* from words spoken, acts done and other objective acts." (emphasis added)); *State v. Dixon*, 2001 WL 209907, *4 2001 Del.Super. LEXIS 66, *15 (Del.Super.Ct. February 15, 2001) ("When determining whether property has been abandoned in the context of search and seizure analysis, the Court must administer an objective test."); *State v. K.W.*, 832 So.2d 803, 805 (Fla.Ct. App.2002) (per curiam) (Nesbitt, J., concurring) ("The test to be applied in determining whether a person has abandoned property is an objective one[.]"); *State v. Harwood*, 133 Idaho 50, 981 P.2d 1160, 1162 (Idaho Ct.App.1999) ("Abandonment, in the Fourth Amendment context, occurs through words, acts, or other objective facts indicating that the defendant voluntarily discarded, left behind, or otherwise relinquished his interest in property."); *State v. Villegas*, 116 Wash.App. 1014, 2003 WL 1091032, *2 2003 Wash.App. LEXIS 416, *6 (Wash.Ct.App. March 13, 2003) ("Abandonment is an ultimate fact or conclusion based generally upon a combination of act and intent.... [I]ntent may be inferred from words spoken, acts done, and other objective facts with all relevant circumstances surrounding the alleged abandonment considered." (second alteration in original) (quotations and citations omitted)).

a police officer followed the robber's escape path. *See Barlow,* 17 F.3d at 87. Along this path, the officer discovered "a car parked at the end of a street, away from any businesses and pointed toward the freeway." *Id.* The officer approached the car and found that it was unlocked, that the engine was warm, and that a key was in the ignition. *See id.* The officer then reported the car's license plate number and was informed that the listed owner claimed "no longer to own the car." *Id.* The officer then looked in the car in an attempt to identify the current owner. *See id.* He opened the glove compartment and found a wallet, Barlow's identification, and some .38 caliber bullets. *See id.* Soon thereafter, the officer caught up to Barlow, arrested him, and, during a search incident to the arrest, discovered a loaded .38 caliber pistol. *See id.* Barlow moved to suppress the evidence discovered during the officer's search of the car, which the trial court denied. *See id.*

¶ 25 On appeal, Barlow renewed his suppression argument. *See id.* The court, in analyzing his claim, set forth the following standard to apply when analyzing abandonment claims:

Under *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967), no warrantless search is lawful if the accused manifested a reasonable expectation of privacy in the object searched. One cannot, however, manifest a reasonable expectation of privacy in an item once it has been abandoned. The test for determining when an object has been abandoned is one of intent, which "may be inferred from words spoken, acts done, and other objective facts." The accused need not have abandoned the searched item in the strict property sense, when an intent to relinquish ownership must be shown; merely an intent voluntarily to relinquish his privacy interest is sufficient. A defendant has abandoned his reasonable expectation of privacy when he leaves an item in a public place.

*Barlow,* 17 F.3d at 88 (citations omitted). In applying this standard, the court determined that "it was reasonable [for the officer] to assume that the car had been abandoned, and the officer was justified in searching the car to identify its owner." *Id.* In so concluding, the court stated that "[t]he only relevant

---

Finally, I believe the holding of *Rowe* conflicts—if not in fact, at least in spirit—with *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), which was decided after we issued *Rowe.* In *Hodari,* the Supreme Court addressed whether the defendant had an expectation of privacy in evidence picked-up by the police after the defendant had tossed it away. *See id.* at 623–24, 111 S.Ct. at 1549. Although the opinion focused on whether the defendant had been unlawfully seized prior to discarding the evidence, the Court, relying on *Hester v. United States,* 265 U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924), concluded that the evidence had been abandoned by the defendant, even though he was being pursued by the police. *See Hodari,* 499 U.S. at 629, 111 S.Ct. at 1552.

In *Rowe,* during a search incident to a warrant, police officers informed the defendant that she was free to leave and escorted her to a bedroom to retrieve her belongings. *See State v. Rowe,* 806 P.2d 730, 736 (Utah Ct.App.1991), *rev'd,* 850 P.2d 427 (Utah 1992). After she retrieved her shoes, she affirmatively claimed that she owned nothing else in the room. *See id.* ("Defendant was allowed to leave the party.... She was conducted to the bedroom to retrieve her shoes and was given the opportunity to claim

any other property that belonged to her. When asked ... she stated that she had retrieved everything in the bedroom that was hers."). Later, police officers discovered defendant's purse, in which they found methamphetamine as well as defendant's identification. *See id.* at 732. Defendant was subsequently arrested, and eventually filed a motion to suppress the evidence. *See id.* On appeal, this court, after first determining that the warrant was flawed (a determination later reversed by the Utah Supreme Court), decided that the defendant had not abandoned her expectation of privacy, but instead she had made "a mere disclaimer of interest to avoid self-incrimination." *Id.* at 736. However, in retrospect it appears that, much like the defendant in *Hodari,* the defendant in *Rowe* essentially tossed away her purse. Thus, she abandoned her privacy interest in the purse. Consequently, it appears that the United States Supreme Court, sub silencio, reversed *Rowe's* abandonment analysis and conclusion.

Accordingly, I believe our abandonment standard to be incorrect and it is our duty to amend it to comport with Federal Fourth Amendment jurisprudence on this issue. Of course, it is possible that the *Rowe* standard comports with the protections afforded under the Utah Constitution. However, that question is not today before this court and is best left to another time.

facts in determining the reasonableness of Barlow's privacy expectation are the location of the vehicle, its condition, the time ..., and other factors that might have indicated an intent to relinquish ownership." *Id.* at 89.[5]

¶ 26 In *Oswald,* the defendant's car "burst into flames" while he was driving through rural Tennessee. *Oswald,* 783 F.2d at 664. The defendant pulled the car to the roadside and leapt from the car, leaving the key in the ignition and a briefcase full of cocaine in the trunk. *See id.* A passing motorist stopped and offered to help, however, the defendant instead asked the driver to take him to a telephone. *See id.* The defendant then left the scene in the car of the passing motorist, an act that was witnessed by a number of others in the area. *See id.* Soon thereafter, local fire and police officials responded to the burning car, and, after the flames were extinguished, the police officer searched the car, finding, among other things, the case containing the cocaine. *See id.* at 664–65.

¶ 27 The officer transferred the items he had found to his patrol car's trunk, took the key (and the steering column to which the key was fused after the fire) and continued prosecuting his duties. *See id.* at 665. Approximately two hours later, knowing full well that the car's owner or driver had neither reported the fire, nor returned to the scene, the officer began to search the items collected from the car. *See id.* Among the belongings, the officer first discovered the defendant's identification, and then the officer pried the briefcase open, discovering a large quantity of cocaine. *See id.* Some time later, the defendant was arrested and charged with possession with intent to distribute, whereupon he moved to suppress the evidence pulled from his car. *See id.* The trial court denied the motion, and the defendant entered a conditional guilty plea. *See id.*

¶ 28 On appeal, the defendant renewed his argument. *See id.* The court, in examining

the issue, stated, "[w]hether property has been 'abandoned,' in this sense does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property; the question, rather, is whether the person claiming the protection of the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place.'" *Id.* at 666 (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). The court further stated that "[n]ot only will privacy expectations vary with the type of property involved, but they will vary with the location of the property." *Id.* at 666–67 (citation omitted); *see Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (establishing the "open fields" doctrine, wherein Fourth Amendment protections are diminished in open fields). Thus, "[o]ne who [chooses] to leave luggage in an unlocked burned-out automobile at the side of a highway in the country can fairly be thought to have a much lower expectation of privacy." *Oswald,* 783 F.2d at 666. Moreover, the fact that "the person happens to be guilty of a crime" does not change the fact that it is reasonable to conclude that a person is considered to have abandoned any reasonable expectation of privacy when they fail to come forward within a short, but reasonable time to claim their property. *Id.; see United States v. Ramapuram,* 632 F.2d 1149, 1155 (4th Cir.1980) ("It is sufficient here to observe that whatever expectation of privacy attends a closed but unsecured 'effect' generally is diminished where the 'effect' itself is placed in an area totally without the protection of the Fourth Amendment such as in an open field.").

¶ 29 In conjunction with *Barlow* and *Oswald,* I also believe *Ramapuram* to be instructive, not, however, on the issue of abandonment, but instead regarding the existence of a reasonable or legitimate expectation of privacy. In *Ramapuram,* the defendant was accused of stealing 100 sticks of dynamite,

---

5. The court also found that "[t]he only fact weighing against the conclusion that the vehicle had been abandoned was that it was still warm." *United States v. Barlow,* 17 F.3d 85, 89 (5th Cir.1994). However, even taking the warm hood into account, the court concluded that "a police officer who discovers an unlocked car at the end of a public street with the key in the ignition could reasonably conclude that the car had been abandoned." *Id.* Thus, the court determined that under the circumstances, signs of recent use were not sufficient to revive a reasonable expectation of privacy.

which federal agents subsequently discovered during a warrantless search. *See Ramapuram*, 632 F.2d at 1151. The defendant had secreted the dynamite in "the trunk of a Chevrolet automobile which was parked in a field on a farm located in Baltimore County, Maryland, and owned by [the defendant's] father." *Id.* The court described the car as a "junker," but noted that it was titled in the name of the defendant's father, for the benefit of his son; thus, the court treated the defendant as the owner of the car. *Id.* at 1152, 1156 n. 12. The car itself was without "current state licence tags, the trunk lock assembly had been removed and the doors were unlocked." *Id.* at 1152. After examining these circumstances, the court determined that the defendant "had no reasonable expectation of privacy" in the car, the contents of its trunk, or its passenger compartment. *See id.* at 1153. The court based this conclusion, in part, on the fact that "the thrust of the Fourth Amendment simply does not extend to locations lacking a foundation for reasonably expecting that the materials will be accorded privacy." *Id.* The court further stated that " '[w]hat is a reasonable expectation of privacy is by definition related to time, place and circumstance.' " *Id.* at 1154 (citation omitted). The court then invoked the United States Supreme Court's test for determining whether a legitimate expectation of privacy "has been invaded by government action." *Id.* at 1154 (quotations and citation omitted).

> " 'This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' " whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.' "

*Id.* (citations omitted).

¶ 30 The court then determined that because, (1) the car had been left in an open field, and (2) under the logic supporting the " 'automobile exception,' " and based on "the actual characteristics of the container" involved, the defendant had no legitimate or reasonable expectation of privacy in the car or its interior. *Id.* at 1155–56. Finally, the court examined the impact of the defendant's ownership status on his expectations, and concluded that ownership, in and of itself, was insufficient to change the outcome. *See id.* Instead, the court focused on the defendant's failure to secure the vehicle, either its doors or its trunk, and the fact the defendant did not live on the property where the car was sitting. *See id.* Thus, the court concluded that the trial court had not erred in denying defendant's motion to suppress. *See id.; see also State v. Rubert*, 2001 WL 1285939, *3, 2001 Tenn.Crim.App. LEXIS 853, **8, 9 (stating "[w]hen an individual flees from a vehicle, he or she is deemed to have abandoned the vehicle, thereby losing an expectation of privacy in that vehicle").

¶ 31 I believe these cases are much more salient to the instant case. Moreover, rather than assuming that Rynhart had a reasonable expectation of privacy in the contents of her purse merely because it was a purse, I believe we must examine the totality of the circumstances to determine whether, under these circumstance, any such expectation would have been legitimate. We will only conclude that the expectation was legitimate "if the individual exhibited an actual, subjective expectation of privacy and [the person's] actual expectation is one that society recognizes as reasonable." *People v. Taylor*, 253 Mich.App. 399, 655 N.W.2d 291, 296–97 (2002). "To determine whether [Rynhart] had a reasonable expectation of privacy in [either her purse or her van] sufficient to challenge the search under the Fourth Amendment, we must inquire whether [Rynhart] 'took the normal precautions to maintain her privacy—that is, precautions normally taken by those seeking privacy.' " *Id.* (citations omitted); *see also Rakas v. Illinois*, 439 U.S. 128, 152–55, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (Powell, J., concurring) (stating "the Court has examined whether a

person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy" (citing *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977))).

¶ 32 In this case, following an accident resulting in her van coming to rest on the property of another, Rynhart chose to leave the van where it sat. She left it unlocked, illegally parked, and in an uncovered, open field. The analysis is thus guided by the objective fact that any expectation of privacy Rynhart may have had in the vehicle is reduced, as a matter of law, because the object in question is an automobile. *See Wyoming v. Houghton*, 526 U.S. 295, 303, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408 (1999) (noting that drivers and passengers "possess a reduced expectation of privacy with regard to property that they transport in cars, which 'trave[l] public thoroughfares.'" (alterations in original) (citation omitted)); *California v. Acevedo*, 500 U.S. 565, 569–71, 111 S.Ct. 1982, 1985–86, 114 L.Ed.2d 619 (1991) (discussing the nature of the automobile exception to the warrant requirement of the Fourth Amendment).[6] Second, Rynhart left the van in an open field, which, as earlier noted, is not subject to the protections afforded hearth and home under the Fourth Amendment. *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924); *see also Oliver v. United States*, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (affirming *Hester* and its principle that no legitimate expectation of privacy arises in open fields). Thus, Rynhart left her vehicle—which traditionally enjoys reduced Fourth Amendment protections—in a field, which enjoys none. She left the vehicle, and its contents, illegally parked and unsecured for several hours following her accident.

¶ 33 In behaving in this fashion, Rynhart, much like the defendant in *Ramapuram*, "'exhibited [no] actual (subjective) expectation of privacy,'" in that, through her actions, she made no effort to "seek to preserve [something] as private." *Ramapuram*, 632 F.2d at 1154 (alterations in original) (citation omitted); *see Pierre v. State*, 732 So.2d 376, 379 (Fla.Dist.Ct.App.1999) ("'Sometimes an automobile takes on the characteristics of a man's castle. Other times an automobile takes on the characteristics of an overcoat—that is, it is moveable and can be discarded by the possessor at will.'") (quoting *Thom v. State*, 248 Ark. 180, 450 S.W.2d 550 (1970));[7] *see also State v. Bradford*, 25 Ariz.App. 518, 544 P.2d 1119, 1120 (1976) (concluding that the defendant abandoned his vehicle when he "fled after attempting to elude a pursuing police car and crashed into a shed on private property"); *Walker v. State*, 228 Ga.App. 509, 493 S.E.2d 193, 194–95 (1997) (concluding that the defendant voluntarily abandoned his vehicle when he left it parked on the roadside in anticipation of an encounter with

---

6. In citing the automobile exception, I in no way mean to assert that the search was justifiable under this exception. Rather, I point to the automobile exception to highlight one of the factors that suggest Rynhart abandoned any legitimate expectation of privacy she may have had under these circumstances.

7. The instant case is not dissimilar to *State v. Wynn*, 623 So.2d 848 (Fla.Dist.Ct.App.1993). In *Wynn*, police officers were investigating a possible drug transaction when they noticed two illegally parked vehicles, one of which was the defendant's truck. *See id.* at 848. The officers also noticed known drug dealers standing near the vehicles talking with the occupants. *See id.* After the officers approached, and the drug dealers fled, the defendant "got out of the truck and departed without saying anything to the officers." *Id.* He "left his truck unlocked and illegally parked.... After forty-five minutes, during which time no one returned to the truck, the officer entered the truck to search for identifica-tion or registration." *Id.* at 848–49. "During this search, the officer saw a balled-up brown paper bag on the floorboard, opened it, and discovered a large quantity of cocaine in individual plastic bags." *Id.* at 849. On appeal from the trial court's denial of a motion to suppress, the Florida Court of Appeals determined that the defendant had abandoned any expectation of privacy he may have had in the vehicle, thus the search did not implicate the Fourth Amendment. *See id.* at 849; *see also Simmons v. State*, 118 S.W.3d 136 (Ark.App.2003) (concluding that the defendant abandoned his privacy interests in a container when he discarded it as he fled from the police); *State v. Kauffman*, 162 Or.App. 402, 986 P.2d 696, 699 (1999) (concluding that the defendant abandoned his privacy interest when he ceded control of the involved container to a third party and "asked them to hide the bag in the bushes on property that did not belong to him").

the police); *Hunt v. Commonwealth,* 488 S.W.2d 692, 693–94 (Ky.Ct.App.1972) (concluding that the defendant abandoned his vehicle after he ran from the police and left his vehicle in a public park for four hours without making any effort to retrieve it); *cf. People v. Hall,* 5 Cal.App.3d 116, 122, 85 Cal.Rptr. 188, 191–92 (Cal.Ct.App.1970); *State v. Rubert,* 2001 WL 1285939, *3, 2001 Tenn.Crim.App. LEXIS 853, **8, 9 (Tenn. Crim.App. October 25, 2001) ("When an individual flees from a vehicle, he or she is deemed to have abandoned the vehicle, thereby losing an expectation of privacy in that vehicle.").

¶ 34 Furthermore, from the available case law, it seems clear that whether or not Rynhart had a *subjective* expectation of privacy in her vehicle, when she left it as she did, she created a situation wherein society is not prepared to recognize her expectation as reasonable. *See Ramapuram,* 632 F.2d at 1154 ("The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." (citations omitted)); *see also United States v. Barlow,* 17 F.3d 85, 88–89 (5th Cir.1994) (discussing voluntary relinquishment of a person's legitimate expectation of privacy in a vehicle); *accord United States v.*

*Oswald,* 783 F.2d 663, 666–67 (6th Cir.1986); *People v. Hall,* 5 Cal.App.3d 116, 122, 85 Cal.Rptr. 188 (Cal.Ct.App.1970); *State v. Wynn,* 623 So.2d 848, 848–49 (Fla.Dist.Ct. App.1993); *Walker v. State,* 228 Ga.App. 509, 493 S.E.2d 193, 195 (1997); *Hunt v. Commonwealth,* 488 S.W.2d 692, 694 (Ky.Ct.App. 1972); *State v. Rubert,* No. M2000–00914–CCA–R3–CD, 2001 WL 1285939, *3, 2001 Tenn.Crim.App. LEXIS 853, **8–9 (Tenn. Crim.App. October 25, 2001); *cf. State v. Bradford,* 25 Ariz.App. 518, 544 P.2d 1119, 1120 (1976) (vehicle deemed to be abandoned following an accident from which the defendant fled); *Commonwealth v. Sinclair,* No. 1018–01-2, 2001 WL 1117050, *3, 2001 Va. App. LEXIS 527, **7–8 (Va.Ct.App. September 25, 2001). I can discern no significant difference between the instant case and the aforementioned cases. Thus, there is no principled reason to conclude that society is prepared to recognize Rynhart's subjective expectation of privacy.

¶ 35 Assuming, for the sake of argument, that Rynhart's actions did not demonstrate her wholesale failure "to preserve [something] as private," *Ramapuram,* 632 F.2d at 1154 (alteration in original), I would conclude Rynhart's action resulted in the reasonable conclusion that she abandoned her expectation of privacy, even under existing Utah law.[8]

---

8. This court, in *State v. Rowe,* 806 P.2d 730, 736 (Utah Ct.App.1991), *rev'd,* 850 P.2d 427 (Utah 1992), made the remarkable statement that abandonment is "primarily a factual question of intent." However, not only do I believe that the abandonment issue in *Rowe* was erroneously decided, *see State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993), I see nothing to support this court's decision to separate Fourth Amendment abandonment analysis from our normal Fourth Amendment analysis. Abandonment should be reviewed as "a mixed question of law and fact." *United States v. Oswald,* 783 F.2d 663, 665–66 (6th. Cir.1986). Thus, as we do in all other search and seizure cases involving the review of a trial court's suppression decision, we should review the trial court's factual findings for clear error, and its conclusions of law for correctness. *See State v. Arroyo,* 796 P.2d 684, 687 (Utah 1990) ("A finding not supported by substantial, competent evidence must be rejected."); *id.* at 689 ("Generally, whether the requisite voluntariness exists depends on 'the totality of all the surrounding circumstances.'" (citation omit-

ted)); *State v. Navanick,* 1999 UT App 265,¶ 7, 987 P.2d 1276 ("The trial court's legal conclusions [made regarding a motion to suppress], however, we review for correctness."). Admittedly, "[v]oluntariness is primarily a factual question," *Thurman,* 846 P.2d at 1262, however, the trial court's ultimate conclusion concerning voluntariness is reviewed for correctness. *See id.* at 1271.

Similarly, I believe that when the central issue is whether or not the defendant has abandoned his reasonable expectation of privacy in a container, vehicle, or other object, "the trial court's underlying factual findings [should] not be set aside unless they are clearly erroneous," but the court's ultimate legal conclusion concerning abandonment should be granted no deference and should be reviewed for correctness. *Id.; see also State v. South,* 932 P.2d 622, 624 (Utah Ct.App.1997) ("We review for correctness the trial court's legal conclusions on motions to suppress. We will overturn the trial court's underlying factual findings only if those findings are clearly erroneous." (citation omitted)).

In Utah, "the abandonment determination [currently] involves two inquiries: (1) whether the individual relinquished a legitimate expectation of privacy in the item; and (2) whether the relinquishment was voluntary." *State v. Bissegger*, 2003 UT App 256, ¶ 14, 76 P.3d 178. Moreover, again under our case law, " '[t]he burden of proving abandonment falls on the state, . . . and must be shown by clear, unequivocal and decisive evidence.' " *Id.* (quoting *State v. Rowe*, 806 P.2d 730, 736 (Utah Ct.App.1991)).

¶ 36 Here, the van had been involved in a single car accident. After crashing through a fence, it came to rest in a marsh, owned by someone other than Rynhart. Following the accident, Rynhart, for reasons unclear from the record, got out of the van, leaving her purse, briefcase, and a half-consumed bottle of liquor, and left the scene. She left the van unlocked, its contents fully available to any curious passerby. She reported the accident to neither the police, nor the property owner. Over five hours later, the police were called to the accident by the property owner, yet Rynhart had made no effort to contact the authorities. Therefore, even if we were to assume that Rynhart maintained a legitimate privacy interest in the van immediately following the accident, the record clearly reflects that Rynhart relinquished her privacy interest in the van and its contents. *See Bissegger*, 2003 UT App 256 at ¶ 14, 76 P.3d 178; *cf. California v. Greenwood*, 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30 (1988) (stating "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public," and " 'what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection' " (citation and alteration omitted)).

¶ 37 It is also clear from the record that the relinquishment was her own decision and not the product of official coercion or force. *Cf. State v. Vancleave*, 2001 UT App 228, ¶ 12, 29 P.3d 680 (equating voluntariness to being " 'free from official coercion' " in the context of waiver of counsel (citation omitted)), *cert. denied*, 40 P.3d 1135; *accord United States v. Flynn*, 309 F.3d 736, 738 (10th Cir.2002) ("In order to be effective, abandonment must be voluntary. It is considered involuntary if

In the instant case, the trial court made very few factual findings concerning this issue, and very few of the facts were subject to any dispute. The court found that a property owner called the Box Elder Sheriff's Department to report a van had been left on his property. The owner further reported that the van had crashed through two fences and come to rest in a marsh. The record supports this finding. The court further found that the vehicle had been in the marsh for over five hours, and the record also supports this finding. The final two findings relevant to this issue were (1) that the State failed to introduce evidence "of the state of the vehicle," and (2) that the vehicle's owner did not have sufficient time to make arrangements to retrieve the vehicle. Nothing in the record supports the second finding. Thus, in the absence of "substantial, competent evidence," this finding must be reversed. *Arroyo*, 796 P.2d at 687. Moreover, given the other facts available to the trial court, I am uncertain of the materiality of the vehicle's condition. Furthermore, the undisputed facts, left undiscussed by the trial court include: (1) Rynhart left the van and its contents unsecured, (2) Rynhart did not report the accident or the location of the vehicle to the authorities, (3) Rynhart did not inform the property owner of the accident or tell him that she was leaving the van on his property, and (4) Rynhart left the scene of the accident, was not hospitalized, and was able to find her way to the impound lot later in the day to collect the vehicle. There was also no evidence, and Rynhart does not argue, that her decision to leave was in any way influenced by the police, removing any possibility that her flight was coerced. *See, e.g., United States v. Flynn*, 309 F.3d 736, 738 (10th Cir.2002). Consequently, I would conclude that Rynhart's behavior was voluntary as a matter of law.

I would also conclude, again after focusing on the totality of the circumstances, that Rynhart abandoned any legitimate expectation of privacy that she may have otherwise had when she left the van as she did. Following the single car accident, during which Rynhart careened through two fences, the van came to rest in a field or marsh. Said field was not owned by Rynhart, nor was it intended (in that it is a marsh) as a parking area. Rynhart left the van and neither reported the accident to the police, nor did she inform the property owner of the accident or her decision to leave the van. Furthermore, when she left, she did not secure the van or its contents, she left an open bottle of liquor in the van, easily seen by anyone passing by, and she left the van where it had come to rest for over five hours. Thus, Rynhart's failure "to seek to preserve [the materials in the van] as private," *United States v. Ramapuram*, 632 F.2d 1149, 1154 (4th Cir.1980), doomed her motion to suppress. She either had no expectation of privacy that society was prepared to recognize, or she voluntarily abandoned whatever expectation she had, as a matter of law.

it results from a violation of the Fourth Amendment.... [P]roperty is considered to have been involuntarily abandoned if the defendant discards it as a consequence of illegal police conduct." (citations omitted)); *Hypolite v. State,* 985 S.W.2d 181, 187 (Tex.App. 1998) ("In order for an abandonment to occur, the decision to abandon must not be the product of police misconduct."); *Commonwealth v. Sinclair,* 2001 WL 1117050, *2, 2001 Va.App. LEXIS 527, *7 (Va.Ct.App. September 25, 2001) ("[I]ntention is a prime factor in determining whether there has been an abandonment. And courts must determine intent ... from the objective facts at hand. Abandonment may be demonstrated, for example, when a suspect leaves an object unattended in a public place." (second alteration in original) (quotations and citations omitted)).

¶ 38 In this case, at the time Rynhart crashed through the fence, she was not, in any way, involved with the police, nor was the police department even aware of the accident until over five hours after it occurred. Thus, her decision was neither the product of police coercion or any other police misconduct, and was, accordingly, made voluntarily. As a result, Rynhart voluntarily relinquished any legitimate expectation of privacy in her vehicle in leaving it as she did following the accident. Consequently, the officer's search of the vehicle did not, in any way, violate Rynhart's Fourth Amendment rights.

¶ 39 For the foregoing reasons, I believe that the abandonment standard we have adopted in Utah is flawed and contrary to generally accepted Fourth Amendment abandonment analysis. At a minimum, we should abandon the subjective approach to the analysis in favor of an objective analysis of intent. However, whether analyzed under the generally accepted standard, or under our flawed approach, I believe that Rynhart abandoned her expectation of privacy in the van. Thus, the trial court's order should be affirmed. Accordingly, I dissent from the majority decision to suppress the evidence discovered during the search.

